305 Madison Avenue
New York, NY 10165
T: 212-922-1080
F: 212-949-8255

Seth L. Rosenberg
Partner
rosenberg@clayro.com

Clayman Rosenberg
Kirshner & Linder LLP

July 20, 2022

Honorable Katherine Polk Failla
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Re:     United States v. Amin Majidi

        18 Cr. 328 (KPF)

Dear Judge Failla:

This firm is counsel to Amin Majidi in the above-referenced matter. We write in connection with Mr. Majidi's sentencing, which is scheduled for July 27, 2022, at 3:00 p.m.  For the reasons set out below, we respectfully submit that a non-custodial sentence is appropriate. In this pre-sentence submission, we seek to familiarize the Court with information about Amin Majidi's background and present circumstances which may bear on the Court's sentencing determination. Much of that information comes from letters addressed to the Court by people who know Amin well and speak to his background and good character.[1]  We also briefly discuss the Premium Point mismarking fraud adduced at trial as well as Mr. Majidi's relative culpability *vis a vis* the trial defendants.  Finally, we address Mr. Majidi's extensive and valuable cooperation with the government.

---

[1] Mr. Majidi's letter to the Court is annexed hereto as Exhibit A.  Letters from Mr. Majidi's friends from school are annexed as Exhibit B.  Letters from Mr. Majidi's work colleagues are annexed as Exhibit C.  Letters from other personal friends and neighbors are annexed as Exhibit D.  Exhibit E contains letters from Mr. Majidi's family.  And Exhibit F contains letters from Mr. Majidi's business friends.

The people who know Amin best, his family members, schoolmates, business colleagues and friends who know him as an adult, describe Amin as a warm, kind and generous man.  In describing Amin, they point to an absence of self-importance and avarice typically associated with Wall Street's "masters of the universe." He has succeeded by working hard, learning the language and mores of a new homeland, taking responsibility for his family's well-being and treating the people he encountered along the way with kindness and decency.  He has never before been accused of any kind of misconduct and it is safe to conclude that he never will be again.

## I.    Amin Majidi's Family Background

Amin Majidi was born in Tehran, Iran fifty-six years ago.  He was twelve when his family left the country, fleeing the Iranian Revolution. They arrived in New Jersey with clothing for a few days and little money, staying with relatives until it became clear that the change of regime was permanent.

Amin's family rented a house in Hillsdale, New Jersey.  Neither of Amin's parents adjusted well to life in the United States. Removed from the important position he held in Iran, and cut off from his extended family, Amin's father sank into a depression and never worked again. (PSR p. 18 at ¶101). Amin's mother was frail and often at odds with his father. Eventually she developed emphysema and then dementia. Both parents became increasingly unable to manage the day-to-day affairs of the family. Three of Amin's four younger sisters suffered from profound mental health issues that continue to this day. (PSR p. 19 at ¶103.)  They struggled to adjust to their new life as well. And so it fell upon Amin, as the oldest child, to take on many of the adult responsibilities within the family at the same time that he was adjusting to a new language, a new school, and classmates. He tried to help his sisters with the difficulties they

encountered.  He helped his parents understand American customs and ultimately took responsibility for seeing that their household bills were paid in a timely fashion. Amin accepted these responsibilities and many more and remained optimistic.

At Pascack Valley High School, one of Amin's classmates, Elsa Marshall, saw some students picking on him. "He never showed if it was getting him down, he stayed positive, but it must have been hard…I cannot imagine how hard it must have been. How much as a kid he must have felt like he was always being judged and had to excel." (Exhibit B at p. 1) Ken Kuhl, another high-school classmate, remembers that "Amin was a quiet, reserved presence, but not shy…He is deep down a kind, considerate person.  People perceive this when meeting him…Looking back, I am still amazed at how well Amin adjusted to his new environment.  He seemed to be the only one in his family to have acclimated well." (Exhibit B at p. 3-4).  Despite the challenges he faced in high school, Amin remembers high school as being where he "felt the hospitality of this country towards an immigrant boy from a hostile country." (Exhibit A, p. 2)

Amin attended college at Columbia University where he studied engineering.  As he has noted in his letter to the court:

> As I began to master English, my grades improved and I did well enough to be admitted to the School of Engineering at Columbia University in 1983, graduating in 1987. My father, who suffered from depression after leaving Iran, worried about the future. He believed that engineering was a profession I could take with me anywhere in the world. I studied mechanical engineering for the first two years and then switched to the Operations Research program that mixed engineering, science, computers and business. That's where I first heard about Wall Street from Professor Katherine Morgan who consulted for Goldman Sachs. I got an internship at Merrill Lynch after my junior year, and then after graduation a friend helped me get a job in the research department at Salomon Brothers [in the mortgage-backed securities sector].  (Exhibit A at p. 2)

Amin moved on to Lehman Brothers in 1993, about the same time that Neil Ahuja arrived there.  He left Lehman in 1998 to go to Greenwich Capital.  In 2000, while serving on

jury duty in state court in Manhattan, he met Michelle Falkenstein, a writer, whom he married in 2003.  They have twin thirteen-year-old boys.  Amin's father and mother died during the pendency of the instant indictment.  The circumstances of Amin's childhood, professional career and family life are set forth in greater detail in his letter to the Court and in the Pre-Sentence Investigation Report.

The people who know Amin Majidi best, his family, friends and business associates, are remarkably consistent in their characterization of him.  Their letters to the Court describe Amin as "kind," "humble," "warm," "thoughtful," "generous," "caring," "compassionate," and "helpful." That is because Amin has an extraordinary capacity to embrace people, take on their cares and concerns and tend to them as though they were part of his family. Amin's generosity is not part of a calculus to advance his career or social standing.  As the letters make clear, Amin's selflessness defines his many and wide-ranging relationships. Numerous examples illuminate this vital aspect of Amin's makeup.

## II.    Amin's Good Character

Margaret Park met Amin 16 years ago at Deutsche Bank, where she had a junior position. At the time she met Amin, she was applying to business school. She wrote:

> I have known Amin Majidi for over 16 years, and our relationship has evolved from colleague and coworker to mentor and friend.... He helped me navigate the application process and think through which schools to consider while applying. He could have stopped there, but he also helped me review and proof my application essays. He was more than generous with his time and efforts, and we had only known each other for a short period of time at that point. It has been an admirable trait of Amin that I have noticed over the years – that he is always interested in developing young professionals and giving them opportunities to grow their career…
>
> Over time, Amin has become one of my closest friends who are like family, who I can reach out to about anything. I have always been able to turn to Amin when I need a sympathetic ear to talk to when I have any troubles, whether

it's due to work, family, or relationships. He was there to be a friendly face when I had to be admitted as an inpatient during my pregnancy. It means a lot to me that he flew out to see that I was ok, just like he would do for his own family. I think that is what has stood out to me the most through the years that I have known Amin; he cares deeply for all those around him who he considers to be family, whether blood-related or not. (Exhibit C at p. 1)

Jill Sand was working as a real estate broker in Manhattan in 2010, when she helped

Amin and Michelle sell their apartment.

> It was during one of the most difficult times in my life because my 27-year-long marriage was unraveling due to the onset of severe mental illness inflicting my husband…. During our business relationship, however, I kept the pain of my private life to myself…. Somehow, though, in a way that was thoughtful and sincere, Amin eventually coaxed from me my personal predicament…. I spoke to Amin about my unfamiliarity with my new life and the challenges it posed, and he in turn gave me honest encouragement like an older sibling or lifelong friend…. His honest and unbiased advice, his truthfulness with me and his kind encouragement, provided the help and guidance that few friends matched.

> Amin has always been there for me… particularly when I learned of my ex-husband's premature death and the loss of three very close friends in rapid succession. Keep in mind that my losses came around the time of his own uncle's death, then his own father's death. I know it was a particularly difficult time for him due to his own family's mourning, yet he was there for me anyway….

> Family life and respect of one's elders are paramount to Amin. So is his loyalty to friends and colleagues. I believe these values emanate from the heart of his Persian culture, which I have learned is one of the ingredients that makes Amin such a heartfelt person…. It is difficult to sum up a decade of friendship in one letter, and difficult to dissect someone's character in a neat and tidy way. Suffice it to say that Amin is the true opposite of a fair-weather friend. Instead of disappearing when times are tough, he seems to materialize to help when he is most needed, his dependability being a key aspect of his personality just like his integrity, honesty, generosity, kindness and sensitivity.  I hope that this letter will help him, although it is a tiny reciprocation for everything he has unselfishly given me over the years. (Exhibit D at p. 1-3)

Jill Sand's experience with Amin is not unique.  Amin met Costanza Mirre, an artist and

filmmaker, through mutual friends in 1994.  She describes Amin as "the most generous and

caring friend, never complaining about anything, always humorous and always supportive and ready to listen about my projects."  Ms. Mirre continues:

> Last year I was diagnasosed (*sic.* throughout this quoted passage) with ███ ████████ and Amin was an incredibly supportive friend. Without saying much he let me know that he was available. Him and his wife made sure I was not alone or in need of anything during my excrutiating six months of ████████ ███████████████████ right before christmas and he made sure I spent it with him and his beautiful family, that I fully rested all the time I needed to and that I was attented to if I needed it. He also drove me into the city for post surgical apointments and then drove me back to his home and family so that I could continue to heal and rest. It is in difficult times when the true nature of a person's carachter shows. I cannot think of a more noble and kinder friend than Amin. I consider myself incredibly lucky to know him and I am so greateful for his friendship and for all the care and support he has given me in a critical time. (Exhibit D at p. 4).

Hannah Applebaum was a junior in high school four years ago, when Amin and his family moved into a home near where she lived with her family.  She became a babysitter for Amin and Michelle's twin sons:

> Amin always chatted with me…. He took an interest in what I enjoyed learning about in school…. Amin made me feel comfortable in that he never shied away from the topic of my older brother passing [by suicide] if it ever came up.  I admire Amin's humility and positive attitude during this time.  (Exhibit D at p. 6)

Amin's selfless kindness extended to the workplace. Joe Irving, who was the Director of Operations at PPI, has known Amin for ten years. Mr. Irving described Amin as "one of the nicest people that I have worked with in over thirty years on Wall Street."  (Exhibit C at p. 2). Darek Chrostowski, who also worked with Amin at PPI wrote that "Amin has always been an upright character in the years that I have known him. He has an outstanding reputation in the professional community and a long list of friends and colleagues that he has helped. Amin is the kind of person that would reach out to all his professional friends trying to find a job for someone that he barely knew but was just laid-off."  (Exhibit. C at p. 4)

Michael Lupin worked with Amin at Bear Stearns more than twenty years ago. They were sitting together at Bear Stearns' mid-town Manhattan headquarters on the morning of September 11, 2001.

> Amin is a man with a heart of gold and always looking for ways to help others. Amin and I were sitting together on the morning of September 11, 2001. At the time, I was living in upstate New York and Amin in Manhattan. Once the bridges and tunnels were shut down, I realized I was stuck in Manhattan until further notice. Most of the other employees left and went home. Those of us with no place to go sat around the TVs in the office watching the events of the day unfold. Even though he lived in Manhattan and could easily have walked home, Amin stayed to keep me company and ensure I wasn't alone. Then he suggested that we walk over to the Citicorp building to donate blood as they were expecting mass casualties at that point. This is one example of the type of person I know Amin to be: Kind, thoughtful, and caring.

> When I was going through personal hardships, Amin was the one person I knew would always be there to cheer me up. During the time Amin and I worked together at Bear, my sister was seriously ill and in the ICU in New York Hospital in Manhattan. Many times, her situation was quite dire, and I tried to visit as often as I could. Amin used to urge me to take a break and run over to see her even though it meant temporarily increasing his workload. Amin's sensitivity towards the plight of others is a trait that is abundantly clear to those who know him well. (Exhibit C at p. 5-6).

Stein H. J. Amundsen, who met Amin twenty years ago at Bear Stearns writes:

> [Amin's] sincerity and concern wasn't just reserved for me alone, but for many others, particularly the younger associates, who were developing their careers. Individuals such as Michael Lupin, David Wong, Staci Arnovitz, Ana Vega, and Giuseppe Corona benefited from his guidance and/or friendship, and not because he was compelled to do so, but simply because that was, and still is, his nature… It wasn't unusual for Amin to take the brunt of any fallout, whether it was his responsibility or not. He truly appreciated having a cohesive, friendly and supportive working environment, rather than taking credit for something or simply directing blame elsewhere. Contrary to so many individuals with whom I had crossed paths or worked for directly, for someone with Amin's intelligence and level of responsibility, he never came across as being arrogant or conceited – if anything, he was more affable, humble and patient, and someone I looked to as a mentor.  (Exhibit C at p. 7-8).

Todd Glick has known Amin for almost twenty-five years, starting when they worked together at Lehman Brothers and then at Bear Stearns.

> He has been an important guide in my work life and a valuable friend in my personal life. I have no hesitancies to telling you how Amin has positively impacted my life…Amin was patient and kind in teaching me the ropes, and we in fact had a lot of fun spending time together both inside and outside work. More notably, Amin was very protective of me. Saying our boss was quite mercurial with a very short fuse would be an understatement, but Amin was always willing to shield me from the worst of it, even at the cost of taking the brunt himself. After being transferred out of the investment area to a trading desk by Bear Stearns, I was laid off in the aftermath of 9/11. Recently married and with a baby on the way, Amin knew I was desperate to find a job and to return to investment management if possible. He, in fact, put me in contact with a friend of his, with essentially the perfect position for me, at a start-up hedge fund. Without Amin's support and encouragement (and reference), I am not sure where I would have ended up, but with that job I was definitely set on the career path which I've followed since that time. (Exhibit C at p. 10).

Alex Gaffan met Amin twenty-five years ago at Lehman Brothers and has since left finance to become a general surgeon in Tel Aviv. He says of Amin, "We've been great friends ever since [Lehman] and I would even go so far as to say that I consider Amin to be as close as family. I consider Amin to be one of the kindest, most resilient, and most honest people I know and I'm truly sick to my core that such a special person finds himself in this terrible predicament. I would trust him with any matter, either personal or professional without the slightest hesitation." (Exhibit C at p. 12).

Amin is similarly devoted to his family. His wife, Michelle Falkenstein, has written to the Court:



> Amin has taken care of his family's finances and helped his parents deal with three ███████ children—Amin's sisters—since he was in his early 20's. His father was depressed from the minute he arrived in America, leaving Amin in a fatherly role. Amin has often told me that if his family hadn't moved to California, he would never have been able to marry me or anyone else and have a family of his own—the care of his family was so all-consuming. It has continued to this day, and the actions of one of his sisters, ████████████████ ████, upends our family life on a regular basis. I have been physically

threatened by her and receive frightening emails up to the present day. But it's nothing compared to the barrage of harassment that she inflicts on my husband. (Exhibit E at p. 2).

Amin's sister, Zarrin Majidi, writes that their parents taught them "the importance of family and that regardless of what life throws our way, to always be there for one another." Amin encouraged Zarrin to become a lawyer. "He not only supported me financially, but also provided guidance, emotional support and gave me the strength to continue when I was at my weakest." When one of their sisters was diagnosed with ███████, "Amin did not give up…. Amin has been by her side during involuntary hospitalizations, for financial support or simply when she needed her brother…. [He] has always played a very important role in our sister's life and in her rehabilitation and treatment. No one has shown love, compassion and loyalty towards my sister the way Amin has." (Exhibit E at p. 3-4).

Amin's uncle, Ali Majidi, writes that he has known Amin all his life, "…and to me he is a kind, thoughtful person, attentive loyal and responsible person. He goes out of his way to bring help to his family and friends. He doesn't hesitate to devote his time and energy to listen, give advice and try to help in any way he can." (Exhibit E at p. 7).

Amin's brother-in-law, Jeffrey Falkenstein writes:

> Having known Amin for so long, I can say that he is a warm and generous person. He is a great husband and an active father to his two boys, my 11 year-old nephews, ███████. He has been very kind and supportive member of our family… When I lost my job in February 2016, Amin was the first person to reach out to me and with offer of support to help me to find a new job; and later, as my job search neared a year, offered to help support my family financially—a form of generosity that I will never forget. (Exhibit E at p. 8).

There are many other examples of Amin's generosity. Masoud Heidari was, like Amin, a refugee from the Iranian revolution.  Also, like Amin, he trained in engineering but chose to work on Wall Street. He has known Amin for more than twenty-five years.  He has written:

     In all my interactions with Amin I have found him to be decent, honorable, kind, and generous. I have also seen him interact with his family as a loving husband and a caring father. On Wall Street Amin was known to be smart, ethical, and hardworking and in our social circle, he was known as a generous and reliable friend and someone who was always ready to lend a helping hand, which I experienced firsthand.

     The past 18 months have not been kind to me. After hospitalization with Covid, I was diagnosed with two types of cancer, which devastated me. I have a loving family, but it is not always easy for me to share all my concerns and fears with them. Amongst all my friends, Amin was the only one who called me every day and drove one hour each way several times a week to see me and to bring me homemade tarts and ice cream. Today, I am in a better mental state, but I could not have done it without Amin's help and for that, I shall forever be in his debt.

And then Mr. Heidari described a remarkable act of kindness by Amin:

     Amin's goodness extends well beyond friends and family. Late last year, Amin offered to give one of his kidneys to the father one of his sons' friends who had a failing kidney, arguing that the man had a small child. Due to Amin's many recent physical and mental ailments, the kidney was unfortunately rejected, which was a source of sorrow for Amin. (Exhibit F at p. 2).

     Steve Cruz is the Director of Volunteer Engagement for Yonkers Partners In Education ("YPIE"). The YPIE program trains volunteers and matches them with students in the Yonkers Public Schools. On March 19, 2019, Amin began to mentor two 9th grade students, supporting and assisting their efforts to gain admission to college.  In October 2021, Mr. Cruz sent Amin the following email.



     Hi, Amin,
I'm sorry for not getting back to you sooner.  I was finally able to reach Uzair's dad last week.  Unfortunately, both ███ Dad and ███ dad have decided to decline the continuation of this mentorship.

This breaks my heart to share with you.   I know that you've built really meaningful relationships with both ███ and especially with ███.  I hope that you find some comfort in knowing that you've made a big impact on the lives and college trajectory for both ███ and ███.  Mentoring them for 3.5 years is a tremendous gift that you've provided.  They are just at the finish line and you got them there.  The self-confidence you nurtured in ███ is something that will last him forever.  (Exhibit D at p. 8).

Amin was devastated.  He had looked forward to seeing the two youngsters he had mentored for so many years succeed. He wanted to be with them to help with college applications and support them if their commitment faltered.  He wanted to be there when they were accepted.  He became depressed by the reality that, because of what he did at PPI, he could not even give away his time as a volunteer.

Many of the other letters to the Court express similar appreciation of Amin Majidi's selflessness and generosity.  In the following sections of this submission, we discuss Amin's role in the offense and aspects of what may have motivated his participation in the crimes to which he has pled guilty.  The letters cited in those sections add another dimension to understanding the makeup of Amin's character.

### III.    Amin's Role In The Offense

Amin has admitted to and taken responsibility for what he did.  He helped Neil set the fraudulent performance targets and he oversaw the monthly challenge process used to achieve them.  He pressed PPI's traders to get the marks that were needed, and he leaned on Jeremy Shor to get results from brokers Amin knew were corrupt. That conduct occurred in the context of the overall scheme in which he, Neil Ahuja and Jeremy Shor were the central actors.

Mr. Ahuja established and led the fraudulent portfolio valuation scheme at PPI. The scheme existed because Mr. Ahuja believed it was essential that his funds maintain an unbroken record of profitability and appear to keep pace with the performance of peer funds, regardless of market conditions and the funds' actual performance.

According to the testimony of James Nimberg, one of PPI's investment managers, Mr. Ahuja told him that, if the investment returns PPI reported to investors were not competitive with other similar funds, investors would redeem their stakes and that would be the end of PPI.

(Nimberg - T227-8).  Beginning in 2014, Neil Ahuja caused the net asset value ("NAV") of PPI's portfolio to be fraudulently inflated each month in order to show positive returns or understate negative returns, and to match or exceed what he understood the performance of similar funds would be.  (Nimberg - T1562; Dole – T265).

The scheme was already underway in April 2014, when Mr. Ahuja appointed Amin to join Nimberg as co-investment manager of the Mortgage Credit Fund ("MCF").  Indeed, inspiration for Neil Ahuja's fraudulent portfolio valuation scheme was an episode in 2013, which Amin describes in his letter to the Court:

> Marc Silie was the assistant portfolio manager of the MCF. In May 2013 there was a sharp downturn in the mortgage credit market.  The marks for that month were down nearly 4%, a huge number by our standards. Marc refused the directions of Hyung Peak, the MCF portfolio manager, and Neil to use challenges to press our pricing sources for higher marks.  As it turned out, May 2013 was only a brief glitch in the market, and prices recovered fully over the next couple of months.  Neil was furious because of the blip in the returns.  He felt that the rapid recovery of prices vindicated his view that PPI should have leaned on its pricing sources to avoid having to take such a drastic markdown.… For years after, Neil complained repeatedly that prospective investors invariably commented on the dip in PPI's performance in May 2013 and that it undermined his ability to promote the fund based on low volatility.  He said he never wanted to see anything like it again.  He said our portfolio managers need to be "market makers not price takers." Marc Silie complained to Suzanne Horowitz, head of compliance, about pressure from Hyung Park and Neil to maximize pricing, and at the end of the year Neil cut Marc's bonus by 90% and replaced him with Jeremy Shor.  Exhibit A, p. 4.

The prices, or marks, which determined the value of the securities in PPI's portfolio came from outside sources, including banks and brokers.  Ultimately three strategies were employed to manipulate those marks to achieve the result Mr. Ahuja set as the firm's performance target each month without regard to the actual returns on PPI's portfolios.  A brief summary of these strategies provides a context for understanding Amin's role in the overall scheme.

The first strategy was to corrupt the challenge process. Legitimate challenges were a normal feature of the pricing process; a request that the pricing source reconsider and adjust their mark in light of information provided by PPI traders concerning their honest view of the market, or because of specific trades they observed. The valuation scheme at PPI relied on illegitimate, unfounded challenges, which were undertaken with no factual market basis, solely to pressure the pricing sources to inflate the marks.

The second strategy began with the arrival of Jeremy Shor.  Shor knew corrupt brokers, who would knowingly provide fraudulently inflated marks, including at time parroting back the specific marks requested by PPI's traders.  The corrupt traders were rewarded with opportunities to do business trading securities with PPI.  They worked on commissions, and the trading revenue flowed directly to them.

The third strategy, which was implemented in 2015, was to obtain fraudulently elevated sector spread values. In the case of honest brokers, this was accomplished through the use of unfounded challenges to sector spread values. With the corrupt brokers, the fraudulent increases were again obtained through the promise of trading activity. Manipulating sector spreads was more efficient and less time-consuming than individual challenges which nonetheless continued. As the values assigned to PPI's portfolio assets increasingly diverged from actual market values, sector spreads became more important because the value of a whole group of bonds in PPI's portfolio could be artificially increased.[2]

---

[2] The use of sector spreads as part of the valuation process was disclosed to PPI's investors in the fund's offering documents until September 2011, when Skybridge, as part of its due-diligence prior to investing with PPI, objected to its use.  Skybridge's objection was referred to Amin in his capacity as Chief Risk Officer and member of PPI's Valuation Committee.  Amin deleted any mention of spreads from the firm's written valuation policy. (PSR p. 11 at ¶¶48-51.) The use of sector spreads nonetheless remained part of PPI's valuation methodology.  Although PPI's

The mismarking scheme operated on a monthly cycle. One of Amin's duties as investment manager of the MCF was to collect end-of-month estimates from PPI's traders concerning the performance of their portfolios. Amin assembled the information to produce a composite picture of the overall performance of the fund and presented the information to Mr. Ahuja.

Mr. Ahuja was in regular communication with Troy Gayeski, the investment manager of Skybridge, PPI's largest investor, and with Daniel Osman, PPI's Director of Investor Relations. From them Mr. Ahuja determined the likely performance of funds similar to PPI, and he decided what performance figures PPI would have to report to satisfy Troy Gayeski and other PPI investors. By the time Amin presented the compilation of traders' performance estimates, Mr. Ahuja had often already communicated to investors his own imagined (and usually inflated) estimate of PPI's performance for the preceding month.

Typically, Neil and Amin would then discuss the performance figure Neil had settled on as an estimate and then they would determine what performance figure might actually be attainable through the fraudulent strategy(ies) in use at that time. It then became Amin's job to communicate the target performance number to PPI's traders and press them to achieve it.

During the days between Neil communicating his initial estimate to investors and the closing of the valuation process, Amin tracked the legitimate marks PPI received, calculated the differential between them and Neil's target, and coordinated the traders' challenges as they tried to reach the inflated target. Amin was aware of Jeremy Shor's "friendly" relationship with Frank DiNucci and with brokers at Performance Trust. Amin and Neil relied on Jeremy to obtain prices

---

outside counsel, auditor and outside administrator were aware of it, the use of sector spreads was not disclosed to investors.

that would cover any shortfall between the target and what the other PPI traders had been able to accomplish with their challenges.  Amin also supported the corrupt practice of artificially inflating the marks with fraudulently inflated sector spreads.

There are no simple answers to the questions, "Why did Amin Majidi stay at PPI and participate in the fraud? Why didn't he confront Neil Ahuja and quit if Ahuja insisted on continuing to perpetrate the scheme?"  However, Amin's letter to the Court does shed some light on these questions.

> I've had a lot of time to think about and try to understand why I became Neil's partner in deceiving PPI's investors.  It's hard to describe what I was experiencing without sounding like I am making excuses. None of this excuses what I did. I see that I could and should have done differently.  I can see myself in Neil's office in September 2015, hearing him say that he promised Troy Gayeski a positive return for the month, and instead of trying to manage Neil's expectations about what performance the scheme could achieve, I should have said, "No. The assets are fine, but the market is down. We can't control that.  We mark the portfolio the way it's supposed to be marked, or I'm out of here."  I didn't believe it then, but I see now that it might have worked.  I would go as far as to say, I owed it to Neil to slap some reality into him because it would have saved all of us from breaking the law. At the time, the thought of quitting because of the pricing pressure and lack of governance at the firm crossed my mind, but I couldn't bring myself to do it.

> Why did I stay at PPI? Except for the pressure on pricing, it was an ideal job for me. I liked the morning strategy sessions at the desk.  I liked the people I worked with.  I did love the diversity of my responsibilities: attending conference panels and debating our research relative to our peers. I loved what I did.

> …..

> During 2014 and 2015, I was in a real sweet spot in my life.  Besides the good things that I was doing at PPI, I had a wonderful family.  I met my wife, Michelle, at jury duty in Manhattan in 2000.  We bonded over our love for food in Chinatown and 1980s music. It was destiny for us to meet, because we later realized that we had attended many of the same concerts two decades before. We married in 2003.  Michelle is a writer. She has a corporate communications job, but she also freelances as a reporter, writing about culture and art: She used to write for the New York Times and Art News, and now for publications in the Hudson Valley.  We have twin boys, born ████████, 2009.  The decision to have children did not come easy for me because of my difficult childhood and history

of mental illness among my siblings. ▮ and ▮ are 13 now and they are the center of our universe. It was through a lot of work and good fortune that we had children in our late 40s.

I always lived a good life, whether it was the life of extraordinary privilege my family had in Iran, or even through the tough years after we fled, but this was a special time for me.  It is my nature to be anxious, and I am somewhat insecure vis-à-vis my bosses.  I wanted my life to go on as it was.  I alternated between ignoring my involvement in the valuation fraud, railing about it to Osman, and conveniently, and irrationally, convincing myself that it would all work out once the market recovered. None of this is meant to excuse what I did. There is no justification for it.  (Exhibit A at p. 6-7)

Amin's observations on why he stayed at PPI after the scheme began is echoed in

his wife's letter to the Court.

I have listened almost daily as Amin has discussed what happened, talking to himself as much as to me, and expressing his extreme regret for his role in it all. He tries to understand how he betrayed his own sense of right and wrong, which is quite fine-tuned. Long before his arrest in May 2018, I recall how he would tell me **[he]** wanted to quit Premium Point, but the truth is he loved the work he was doing and the people he hired to work with him. I remember how he fought to get his people the bonuses they deserved, and I recall one year when he worked at Deutsche Bank and he gave up part of his bonus so that his team would be paid fairly. Losing everything when he was 12 and forced to flee Iran gave him a different perspective on money—he knows that everything can be lost in a moment. Working was not just about making money; he genuinely enjoyed being paid to think creatively about financial vehicles that most people (myself included) can't understand. (Exhibit E at p. 1)

Shir Nir was an executive coach hired by PPI in 2012.  He had a unique "outsider's view"

of how Amin functioned at PPI. In his letter to the Court, Mr. Nir has written that "…all was not

good.  Amin was not willing to face up to the other partners and his boss who dealt in deception

and half-truths.  He seemed was [sic.] overly insecure in his position, and instead of believing he

had achieved his position from ability that it was all because of some personal grant from the

head of the company…My nickname for Amin was "chicken" because [he] was so scared of

conflict. In his position of responsibility, it was not proper for him to be a "Pleaser." (Exhibit C

at p. 14)

16

IV.     **Amin's Motives**

Amin, Jeremy and Neil put their own interests ahead of the interests of the investors who trusted them. They deceived investors about PPI's performance to deter them from withdrawing their investments which they believed would have caused PPI to fail.  Until it unraveled, the valuation scheme enabled Amin, Jeremy and Neil to keep their highly compensated jobs and their reputations as successful operators in the competitive field of managing hedge funds, particularly in the small world of hedge funds dealing in mortgage-backed securities.  They were all motivated by a fear that PPI would fail.

Neil told Amin, James Nimberg, Ashish Dole and others that if PPI didn't report competitive results to its investors, they would pull their money and PPI would fail.  As the sole owner of PPI, Neil would have fully felt the financial and reputational impact of PPI's failure.

Jeremy Shor's motive was clear: he wanted to be paid a premium for knowing and dealing with corrupt brokers to obtain fraudulently inflated marks. Ashish Dole testified that on a Friday night in late October 2015, he had a conversation about bonuses with Jeremy in a bar near PPI's office. Jeremy wanted the same $1,000,000 bonus he received for 2014, and he was worried he wouldn't get it.  Jeremy told Ashish that he was going to write down the value of his bonds by $16,000,000 that day to "let management know that if he left, Premium Point would not be able to get the prices, the elevated prices, that we were getting from his contacts and we would have to show a similar size loss…" And Jeremy not only talked about it; he did it.  That Friday night he marked down his portfolio by $16,000,000.  (Dole T347:8-354:1). He wanted to show Neil and Amin the value of his participation in the PPI valuation scheme.

Amin's involvement in the scheme was also motivated by a desire to keep PPI functioning, to keep his highly compensated position, and to maintain his lifestyle.  As Amin put it in his letter to the Court:

> I understand that I was making by any standard a lot of money when I worked at PPI. Most years it was around $1million on an annualized basis, a little less than I made at Deutsche Bank, and I didn't feel pressured to make more.  I was reasonably sure I could have made the same money working elsewhere, but I liked my team and the fact that I had a mandate to grow the lines of business beyond residential loans made prior to the financial crisis.   In 2013, when I did make $4 million at PPI, my compensation had nothing to do with the MCF or mismarking. We had two closed-end funds, one for MIT and one for Divco.  When the investment term for those funds ended in 2013, PPI, and I as a PPI partner, were compensated based upon the profitability of the investment, which was measured by the difference between what the investors put in at the beginning and what money was actually returned to them at the end.  No other valuation process was involved or needed. This (to me) extraordinary number was cumulative for the years since 2008 when I didn't receive a bonus.  (Exhibit A at p.6).

Amin didn't participate in the scheme solely to get more money. In 2015, at the same time Jeremy Shor was holding PPI hostage to get the $1 million bonus he wanted, Amin declined to accept the $500,000 bonus he was offered. Instead, Amin asked Neil to give the money to the junior members of his team.

Amin liked working at PPI.  He respected most of his colleagues and found the work interesting.  Unlike the others, he wanted the "sweet spot" in his life, a job he enjoyed and a flourishing marriage, to continue undisturbed.  To achieve that, he willingly partnered with Neil and Jeremy in the mismarking scheme.

People who knew Amin well have provided valuable insights into his character which bear upon an understanding of his motivation to break the law. Hamid Zanganeh met Amin when they both worked at Lehman Brothers twenty years ago. In his letter to the Court, he noted that "In the hedge fund business, it is very easy to get trapped in the glamor lifestyle or feelings of self-importance.  In my opinion, for Amin it was never

about greed or ego.  He truly loved what he did and always acted with honorably [sic.], treated everyone with respect, conducted his job with ultimate dedication to excellence and professionalism.…" (Exhibit C at p. 17).

Lucio Amadio, who has known Amin for more than twenty years has a similar view of Amin: "It became clear to me that Amin was a very atypical finance man. I feel that with Amin I got to see beyond a façade. His vulnerability, his genuinely good spirit, his humility and appreciation for the small things in life most overlook or take for granted. I never got the feeling he was out to impress, to compete with others or to show off." (Exhibit D at p. 10).

### V.     Amin's Family Depends on Him

Long before the death of his parents, Amin was the one who helped his family navigate their new life in America.  He organized their housing, paid their bills, and, to the extent possible, helped them solve the routine problems they confronted each day. He also took on primary responsibility for managing his sisters' illnesses.  He continues this important role in his family today.

Besides his wife and twin sons, Amin's family includes his four sisters, all of whom live in California, where he visits them frequently. ██████████████████████████████ ████████████████████████████████████████████████████ ████ and lives alone in the family home now that their mother has passed away. A third sister sees to her daily nee██████████████████████████████████ .

Amin's father died during the pendency of this indictment on April 25, 2019.  His mother died on December 30, 2021.

Amin's uncle, Ali Majidi has written the Court that, "A year ago, Amin's father passed away leaving behind his elderly sick wife and four daughters, two of whom are unable to work, were financially dependent on him and lived under his roof.  All of this is now the responsibility of Amin.  Not only does he have to be there for his wife and young sons, whom he cherishes immensely, but also he has to look out for his mother and sisters."  (Exhibit E at p. 6-7).

Amin worries constantly about the impact a sentence of incarceration may have on his sons.   Masoud Heidari writes,

> I know that what Amin did was wrong, but I also see how he has suffered because of it. He is genuinely remorseful and feels the pain that he has caused many, including his own family. Amin has lost almost all his savings, is worried about supporting his elderly mother and invalid sisters in the future and has lost any opportunity to ever work on Wall Street or to be employed by any other established firm. He has been shunned by friends, rejected by a charitable institution, and forced to decline a spot on the board of a charity where he has for years been a significant contributor. He tells me that many nights, when the guilt-demons keep him awake, he goes into his sons' rooms and cries fearing what may come of them as he awaits sentencing.

> Your honor, I beg for your mercy in Amin's sentencing. Amin is a decent man who did wrong, but many have relied and continue to rely on his decency and generosity for emotional and financial support. I fear that any period of incarceration would have a devastating effect on him, his friends and family, and especially his two young sons who have already been through more than any child should experience.  (Exhibit F at p. 2).

## VI.    Amin's Acceptance of Responsibility

It has been more than three years since Amin was arrested on the instant charges.  He has had considerable time to reflect on the circumstances and the conduct on his part that brought him before the Court.  He has talked about his responsibility for the wrongdoing at PPI with some of his closest friends and family, and many of the letters to the Court mention this.  The following are but a few examples. Reza Vishkai, like Amin, a refugee from the Iranian revolution, has known Amin since the early 1980's when they worked at Salomon Brothers.

He has already pled guilty to the events that transpired at Premium Point
so there is nothing more to say about it and his life will never be the same.
However, I feel it is important to point out that in his discussions with me, he has
been contrite to the point of despair. The contrition is not so much due to the
opprobrium that he has endured but to the fact that he did not do well by his
clients. When you manage other people's money, and you are a person of
integrity, there is nothing more hurtful than being a part of something that does
damage to them; that is something that he will struggle with for the rest of his life.
(Exhibit F at p. 3-4).

Ali Rezaizadeh, another refugee from the Iranian revolution, has been a friend of Amin's

since 1994, when they met at a friend's wedding.  He has written:

In our immigrant society that prides itself on being educated, highly
principled and successful, Amin has become ostracized and a pariah.  For
example, he would not come to my mother's funeral, not to make the attendees
and me uncomfortable. He chose to meet me privately. Amin is hanging his head
very low. I still believe in Amin and trust him.  He knows he has done wrong, and
he is paying a heavy price emotionally and financially.  Being dislodged from the
society of your peers and compatriots is jarring and harrowing, and for the second
time he has to go through with it; this time with the full realization that he is the
cause of his own demise. (Exhibit D at p. 13).

Amin's wife has written to the Court that:

I cannot imagine that Amin could feel more remorseful for his part in what
transpired at Premium Point. If the point of incarceration is punishment, the
punishment that Amin has already put himself through is greater than anything
our penal system could devise. If the point is to give a person time to understand
what they did wrong, Amin is already extremely aware and regretful
of his mistakes. His full cooperation in this case demonstrates his willingness to
accept responsibility for his wrongdoing and put things to right. (Exhibit E at p.
2).

Chuck Adelman, a friend of Amin since their days at Pascack Valley High School, has

written, "My heart was broken when Amin revealed to me about his wrongdoing. In our

subsequent discussions, he has always accepted responsibility for his actions, and never blamed

anybody else."  (Exhibit B at p. 5).

As further evidence of Amin's acceptance of responsibility, he elected to cooperate with

lawyers representing Skybridge Capital and Youngstown State University Foundation in their

lawsuit relating to the valuation scheme. He participated in a de-briefing that lasted for several hours, answering questions for the attorneys for Skybridge and Youngstown, who found the information Amin provided to be very helpful.  Ultimately, Amin was able to reach a financial settlement of the Skybridge and Youngstown cases against him for which he paid the plaintiffs $200,000.

**VII.    The Impact of Three Years Awaiting Sentencing**

Amin was arrested on May 9, 2018.  On his behalf, we began discussions regarding his cooperation with the government on May 15, 2018. He pled guilty before the Court on October 31, 2018.  He testified at the Neil and Jeremy's trial during June of 2019.  Amin has been waiting since then to be sentenced, uncertain what fate awaited him.

As the Court surely knows, the anticipation of punishment can be a harsh form of punishment in and of itself. Amin's sentencing has been hanging over him and his family for an unusually long time. ███████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████.

As Amin waited to be sentenced, his financial situation, which was substantially altered in the wake of his arrest, continued to deteriorate. He is unemployable in the financial industry, and as a convicted felon awaiting sentencing, he is virtually unemployable in any other industry. He has worked hard to develop his vintage watch business, but one bank after another has dropped him due to his criminal record, and a month ago, one of the major auction houses dealing in vintage and antique watches refused to let him bid for the same reason.

As we noted earlier, Amin has now been prevented from continuing to mentor the two young students he spent years counseling in an effort to get them to go on to higher education. He has worried endlessly about how his sentencing will affect his young children and his marriage. The sentencing has stood for years now as a marker for the conclusion of everything that has brought Amin before the Court.  It is a goal post that has been repeatedly moved.

## VII.   Relevant Sentencing Considerations

### A.  Amin's History and Characteristics

The conduct charged in this case, which Amin has admitted and for which he has accepted responsibility, is a singular departure from a lifetime of hard work, commitment to family, humility and good deeds.  Prior to the events which gave rise to his indictment, his honesty and integrity were never questioned.  As noted earlier in this submission, Amin is the antithesis of a Wall Street "Master of the Universe."  He has succeeded by working hard and treating the people he worked with fairly and with kindness.  His generosity to the people he met along the way is well-documented.  He embraced others and helped them because it was his nature, not because there was some potential benefit to Amin in return.  Like all people, Amin is surely flawed, but he is a good person who, apart from the events that took place at PPI from 2014 to 2016, has tried to lead a good life.

In judging Amin, we ask the Court to see him in full and not merely in the context of his transgressions.

### B.  The Nature and Circumstances of the Offense

Amin was an integral part of the multi-year conspiracy at PPI to inflate the price of PPI's portfolio and thereby defraud PPI's investors.  His participation occurred at both ends of the monthly pricing process. At the beginning of each month, he worked with Neil to create targets

for PPI's NAV.  The targets were based on the performance Neil deemed necessary to satisfy investors without regard for PPI's actual performance.  Later in the month, Amin pressed PPI's traders to achieve the targeted performance.

But there were key roles in the fraud in which Amin did not play.  Amin did not create the portfolio marking fraud at PPI.  Neil Ahuja did that.  It was not Amin's idea that PPI do business with corrupt brokers who would provide fraudulently high values for portfolio assets in exchange for an opportunity to trade with PPI.  Jeremy Shor did that.  Amin did not propose the use of sector spreads as a lever to facilitate the scheme. PPI traders did that.  But Amin was nonetheless an integral part of the scheme. He pressed traders to aggressively challenge marks so as to achieve the targeted NAV.  He accepted and willingly employed the inflated performance figures to deceive PPI's investors, induce them to invest additional funds, deter them from withdrawing investments from PPI.

As noted earlier, Amin did not participate in the fraudulent marking scheme solely to enrich himself.  In fact, in 2015 Amin asked Neil to distribute his $500,000 bonus among his subordinates.  With the exception of income he received from the closing-out of two funds which ante-dated the fraud and had nothing to do with it, Amin's compensation at PPI was roughly what it was during his prior employment elsewhere.

### C. Amin's Cooperation with the United States Attorney's Office

Amin Majidi's cooperation with the government began within weeks of his May 9, 2018 arrest.  His first meeting with the prosecution team was on June 18th and was followed by more than twenty-five additional sessions, many of which lasted all day, and several of which continued into the evening.  Amin's testimony at the trial of Neil Ahuja and Jeremy Shor lasted for four days in June 2019.

According to Assistant United States Attorney Andrea Griswold, Amin "was an important cooperating witness, who began cooperating shortly after his arrest, and provided substantial assistance to the Government, including testifying about complex valuation issues at trial…." (July 13, 2022 letter to Court, page 1).

> Majidi was a key Government witness at Ahuja and Shor's 2019 trial. Majidi provided detailed testimony about the specifics of the fraud, including the origins of the scheme, how the scheme evolved, Ahuja's and Shor's respective roles in the scheme, and specifics of their misconduct. Because of Majidi's relationship with Ahuja, Majidi provided powerful testimony about Ahuja's role in the scheme. Majidi's testimony was corroborated by other government witnesses and exhibits. (*Id*. at p. 4)

In articulating the significance of Amin's trial testimony, the government notes:

> Majidi played a critical role as a witness at Ahuja's and Shor's trial. Majidi clearly and fully testified about the conduct of his co-conspirators, served as a central narrator of the conduct at issue, and explained in simple terms to the jury the complex worlds of RMBS, securities marking, and the hedge fund industry…. Majidi's testimony brought the criminal conspiracy to life and provided the jury with direct proof of the criminal schemes – particularly with respect to Mr. Ahuja. Like most complex financial crimes, these types of crimes are hard to explain to a jury without an insider like Majidi, who had accepted responsibility for his crimes. (*Id*. at p. 5).

The government has also noted that Amin lied during preparation for trial about the source of funds in a Standard Chartered Bank Account in Dubai. As Amin explained:

> Soon after I was arrested in May 2018 the government showed an interest in my cooperation. I agreed to cooperate immediately. I met with the prosecutors more than 25 times, probably a hundred hours or more. I told them about what happened at PPI, and I gave them truthful details about my involvement and the involvement of others in the valuation scheme. After cooperating for about a year, and just before Neil and Jeremy's trial was about to begin, they asked me about a Standard Chartered Bank account I had opened in Dubai in 2008 or 2009. Standard Chartered closed the account in 2015. I believe I had told them about the account in the early days of my cooperation when they were going through my financial background.

In May 2019, I learned that the trial defendants had subpoenaed Standard Chartered seeking my account information.  The government asked me what the account was used for.  The account had been used to receive the proceeds of the sale of a family property in Iran on my father's behalf, approximately $900,000, which I then transferred to a US bank.  Instead of answering truthfully, I panicked.  I thought that moving the proceeds from Iran might have violated U.S. Iran sanctions. I was afraid that if the government knew about it, they might not continue with my cooperation.  In that moment I decided that I couldn't tell the prosecutors the truth.  I couldn't even discuss it with my lawyers.  So I said that the account had been opened, but that the property transaction never went through and the only money that passed through the account was my initial deposit.  By the next day, the government made it clear that they knew the truth. I admitted to them what I had done and told the full story, as I did again at trial. (Exhibit A, p. 7)

**D.      The Trial Defendants' Sentences**

Neil Ahuja and Jeremy Shor were initially sentenced to terms of fifty and forty months respectively.  Those sentences were vacated when their convictions were reversed.  On April 22, 2022, this Court resentenced both defendants to time served, with no supervised release, fines or restitution ordered.

In her letter to the Court, Assistant United States Attorney Griswold has written, "In addition, in sentencing Majidi, and based on the unique facts and history of this case, the Government believes it is appropriate for the Court to consider the sentences of time served with no additional penalties that were imposed upon Ahuja and Shor. In particular, the Court's sentence should reflect the need to avoid unwarranted sentencing disparities between the defendants in this case." (See 18 U.S.C. § 3553(a)(6)) (*Id*. at page 6).

## CONCLUSION

For the reasons set forth hereinabove, we respectfully request that the Court impose upon Amin Majidi the sentence recommended by the Government and consistent with the sentences imposed upon the trial defendants.

Respectfully submitted,

/s/

CLAYMAN ROSENBERG KIRSHNER & LINDER LLP

By:     Seth L. Rosenberg
        Brian D. Linder

Cc:     Andrea M. Griswold
        Assistant U.S. Attorney