

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 13, 2022

<u>BY EMAIL</u>

The Honorable Katherine Polk Failla
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

   Re: <u>United States</u> v. <u>Amin Majidi</u>,
      18 Cr. 328 (KPF)

Dear Judge Failla:

   The Government respectfully submits this letter in connection with the sentencing of defendant Amin Majidi, which is currently scheduled for July 27, 2022, to advise the Court of the pertinent facts concerning the assistance that Majidi has rendered in the investigation and prosecution of others.  Majidi was an important cooperating witness, who began cooperating shortly after his arrest, and provided substantial assistance to the Government, including testifying about complex valuation issues at trial against his former boss and co-worker.  In light of these facts and Majidi's substantial assistance, and assuming that Majidi continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence Majidi in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

   In addition, and consistent with the representations the Government made to the Court at the time that Anilesh Ahuja and Jeremy Shor pleaded guilty and were sentenced on April 22, 2022, the Government also seeks the following specific sentence for Majidi: (a) time served; (b) no term of supervised release; (c) no restitution; (d) no forfeiture; (e) no fine.  The standard special assessment should be imposed.

Procedural History

   On May 9, 2018, the Government unsealed Indictment 18 Cr. 328 (KPF), which charged Amin Majidi, as well as Anilesh Ahuja and Jeremy Shor, in four counts for their involvement in a scheme to mismark the value of securities in hedge funds managed by Premium Point Investments, LP ("PPI" or "Premium Point").  Specifically, the Indictment charged Majidi, Ahuja, and Shor with (a) conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, (b) conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, (c) securities fraud, in violation of 15 U.S.C.

§§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2, and (d) wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.

On October 31, 2018, Majidi pled guilty, pursuant to a cooperation agreement, to the Indictment.

Offense Conduct

The Government agrees with the statement of offense conduct set forth in the draft Presentence Investigation Report, dated June 16, 2020 (the "PSR). (PSR ¶¶ 13-64).

As the Court is aware from presiding over the trial of co-defendants Ahuja and Shor, at which Majidi testified, Premium Point was a New-York based investment firm founded by Ahuja that managed hedge funds focused primarily on structured credit products. Premium Point's flagship hedge fund was the Mortgage Credit Fund (the "MCF"), which launched in October 2009. Premium Point also launched a segregated ERISA fund that held the same positions as the MCF. In 2013, Premium Point launched the New Issue Opportunity Fund (the "New Issue Fund"), which purchased and securitized pools of mortgages that were not issued or guaranteed by a government agency. The New Issue Fund required investors to "lock up" their funds for three years, after which investors would have the option of remaining for a fourth year. By contrast, investors in the MCF could redeem on a quarterly basis. For the first several years of its existence, Premium Point was successful and enjoyed a reputation as one of the premier firms in the residential mortgage backed securities ("RMBS") hedge fund industry. At times between 2009 and 2016, Premium Point managed billions of dollars in assets. Premium Point earned fees based on the amount of assets under management and its performance. (PSR ¶¶ 14-16).

Majidi joined PPI in 2008 as the Chief Risk Officer, a position he held until March 2014. In March 2014, Majidi became the portfolio manager for the MCF. In 2011, Majidi became a partner in PPI and was allocated approximately seven percent in phantom equity, meaning he was entitled to a percentage of the firm's profits, but did not actually own equity in the firm. By the time Majidi left PPI in 2016, his phantom equity allocation was approximately 6.46%. (PSR ¶¶ 17).

Between approximately January 2014 through April 2016, Majidi participated in a scheme to defraud Premium Point's investors in the MCF, ERISA Fund, and the New Issue Fund by deceptively mismarking each month the value of certain securities held in those funds, and thus fraudulently inflating the Net Asset Value ("NAV") of those funds as reported to investors and potential investors. Premium Point mismarked securities in two primary ways. First, Premium Point secured fraudulently inflated quotes for particular securities from corrupt brokers, primarily Frank Dinucci. Second, PPI fraudulently calculated a so-called "imputed mid" price for particular securities by improperly adding a so-called "sector spread" to a bid price. By using this valuation process, PPI also fraudulently inflated the price of particular securities. The effect of the mismarking scheme was to materially overstate the reported NAV of certain of the firm's funds, at times by millions of dollars across the funds managed by the firm. As a result of the fraud, investors were left with the impression that their investments were performing better than they

actually were, and PPI was in a position to charge higher management and performance fees than would otherwise have been possible.  (PSR ¶¶ 30-32).

The mismarking scheme evolved as a result of demands by Ahuja, as well as Majidi, that Premium Point's funds appear competitive with peer funds and not reveal the full extent of their losses.  With respect to the New Issue Fund, Ahuja made these demands largely without Majidi's involvement.  (*See, e.g.,* Tr. 255-56 (Dole testifying that Majidi played no significant role in the New Issue Fund); Tr. 1654 (Nimberg testifying that "[i]n practice," Ahuja ran the New Issue Fund); GX 870-P (Sept. 11, 2014 text messages — Nimberg to Majidi:  "Please call.  We have to chat.  I think There's [sic] something stupid going on." / Majidi to Nimberg:  "True. And they don't lose money. It's just that they mark shit up and show false returns")).  In the 2014 period, the goal of the mismarking scheme was to develop an edge against competitors and to exaggerate the level of success that PPI was enjoying.  (Tr. 2157 (Majidi)).  Over time, as financial markets worsened, the degree of mismarking at Premium Point increased and the purpose of the mismarking shifted to concealing from investors the degree of the funds' losses.  (Tr. 2108 (Majidi: "In 2015, it became about hiding losses and preventing redemptions.")).  The goal of the scheme was to prevent redemptions of investor funds likely to occur if returns were uneven or poor.  (Tr. 2133 (Majidi testifying that Ahuja thought the Firm had lost business in 2013 when former trader Mark Silie had marked down his portfolio, and that Ahuja never wanted to see that happen again); PSR ¶¶ 33-44).

Ahuja was ultimately responsible for setting the inflated target returns that the fraud was designed to meet, giving his employees, including Majidi, explicit instructions to inflate the value of the securities in their portfolios.  (*See, e.g.*, GX 840-Y (Majidi telling Osman "[t]he reason the book is over marked is because [Ahuja] would lie to Troy [Gayeski of SkyBridge]"); GX 870-DD (Nimberg telling Majidi that "[Ahuja] has to stop ratcheting up the monthly stress"); GX 858-Q (referring to Ahuja, Dole telling Shor that "[b]ig boss was here.  Saying push for 2.5mm in [MCF]."); Tr. 1565 (Nimberg testifying that the monthly targets were set by Ahuja); GX 859-G (Mark Ginsberg complaining to Dole that "[w]e just told [Ahuja] we are mismarked by 400 bps and he's asking for 60 bps.  This has to end."); Tr. 1562 (Nimberg testifying that Ahuja began giving him instructions to inflate the value of bonds in 2014 and that "[t]hese instructions were given to us on a monthly basis")).  Ahuja told traders to "squeeze the dealers," which meant pressure pricing sources to agree to higher marks.  (PSR ¶¶ 33-44).

In addition to "squeezing" dealers for inflated price quotes, one of the methods that Majidi, as well as Shor and Dole, used to execute the mismarking scheme was to obtain inflated sector spreads from dealers and add those spreads to bid prices for specific securities to arrive at imputed mid prices.  Ahuja encouraged this method of overmarking.  The Firm's Valuation Policy made no reference to an "imputed mid" price for a security and did not disclose the use of sector spreads for pricing purposes.  In fact, in late 2011, SkyBridge had specifically insisted that broker quotes not be altered through the use of a sector spread — in emails on which Ahuja and Majidi were copied (GX 1004, GX 1012) — and Premium Point agreed to remove the option to use sector spreads for pricing purposes from its Valuation Policy.  (PSR ¶¶ 45-51).

In October 2015, Ernst & Young ("E&Y") began an audit for Premium Point's 2015 fiscal year.  After reviewing a sample of the marks that Premium Point used, E&Y became concerned

about pricing differences and engaged in a broader review. In April 2016, as a result of its review, E&Y informed Ahuja that it would not be able to complete the 2015 audit as scheduled and that a restatement of the NAV for certain of Premium Point's funds was likely necessary. Later that month, PPI informed investors in those funds that Premium Point would be restating the NAV for the time period beginning in late 2015. Premium Point ultimately issued a restatement (the "Restatement") for the period of September 2015 through March 2016 (the "Restatement Period") and disclosed that it had overstated the NAV in certain of its funds by between 13 and 15 percent. The Restatement precipitated criminal and regulatory investigations of Premium Point. (PSR ¶¶ 57-64).

Cooperation

As set forth below, Majidi has provided substantial assistance to the Government, and his cooperation played a key role in the original conviction of co-defendants Ahuja and Shor at the 2019 trial.

Shortly after Ahuja, Majidi, and Shor were arrested on May 9, 2018, the Government reached out to Majidi's counsel to see whether Majidi was interested in potentially cooperating with the Government. Majidi began to proffer with the Government approximately five weeks later, on June 18, 2018. Majidi proffered with the Government five times between then and early August 2018. On October 31, 2018, Majidi pled guilty to the Indictment, pursuant to a cooperation agreement.

As the Court is aware, Majidi was a key Government witness at Ahuja's and Shor's 2019 trial. Majidi provided detailed testimony about the specifics of the fraud, including the origins of the scheme, how the scheme evolved, Ahuja's and Shor's respective roles in the scheme, and specifics of their misconduct. Because of Majidi's relationship with Ahuja, Majidi provided powerful testimony about Ahuja's role in the scheme. Majidi's testimony was corroborated by other Government witnesses and exhibits.

During trial, however, the Government learned about other wrongful conduct that Majidi had not previously disclosed to the Government. In particular, Majidi admitted to lying to the Government about the transfer of proceeds from the sale of a piece of Iranian land owned by his family out of Iran to the United States. Majidi said that he failed to disclose this money transfer because he was afraid that he had broken U.S. sanctions law. (Tr. 2245-46). Majidi was thoroughly cross-examined about this and other conduct during trial. (Nov. 22, 2019 Tr. 16-17).

While the Court ordered a new trial for Ahuja in Shor in December 2021, the reasons the Court granted a new trial had nothing to do with the cooperation or conduct of Majidi. Thus, in the Government's view, Majidi's cooperation in the 2019 trial should be afforded the same weight as if no new trial had been granted.

Applicable Sentencing Guidelines

The Government agrees with Guidelines calculation in the draft PSR and that the applicable Guidelines range is 151 to 188 months.  (PSR ¶¶ 79-34, 140).  However, for the reasons set forth below, the Court should not sentence the defendant within this range.

Section 5K1.1 Factors

Section 5K1.1(a) of the Guidelines provides that the Court is to consider the following five, non-exclusive factors in deciding upon "[t]he appropriate reduction" from the otherwise applicable sentencing range.  The application of each of those factors to Majidi's cooperation is set forth below.

1.  *"[S]ignificance and usefulness" of assistance (§ 5K1.1(a)(1))*.  Majidi played a critical role as a witness at Ahuja's and Shor's trial.  Majidi clearly and fully testified about the roles of his co-conspirators, served as a central narrator of the conduct at issue, and explained in simple terms to the jury the complex worlds of RMBS, securities marking, and the hedge fund industry. Majidi's testimony allowed the Government to present a complete story of the fraud at PPI to the jury, and it gave the jury a firsthand view of the conversations and interactions he had with Ahuja and Shor, among others.  While the emails and documentary evidence in this case were powerful evidence of the defendants' guilt, Majidi's testimony brought the criminal conspiracy to life and provided the jury with direct proof of the criminal schemes — particularly with respect to Ahuja. Like most complex financial crimes, these types of crimes are hard to explain to a jury without an insider like Majidi, who had accepted responsibility for his crimes.

2.  *"[T]ruthfulness, completeness, and reliability" of information and testimony (§ 5K1.1(a)(2))*.  The Government has never had any reason to doubt that the information about the charged conduct that Majidi provided was truthful, complete, and reliable.  In fact, much of the information and testimony provided by Majidi was corroborated by other documentary evidence and witness testimony, including from the other cooperating and immunized witnesses in this case.

However, as noted, Majidi admittedly lied to the Government about his efforts to transfer the proceeds of a land sale from Iran to the United States.  Majidi's agreement with the Government required him to disclose this conduct to the Government, but he failed to do so.  Majidi only admitted to this conduct when confronted by the Government on the eve of trial.

3.  *"[N]ature and extent" of assistance (§ 5K1.1(a)(3))*.  As noted above, Majidi testified at length at the Ahuja's and Shor's trial, and prepared with the Government on numerous occasions.  Ultimately, his testimony helped lead to the convictions of both defendants.

4.  *"[A]ny injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance (§ 5K1.1(a)(4))*.  The Government is not aware of any injury suffered by Majidi or his family as a result of his cooperation.  Whether he was threatened or not, however, it is inherently risky for a criminal defendant to cooperate with the Government.

5.  *"[T]imeliness" of assistance (§ 5K1.1(a)(5)).*   As noted above, the Government approached Majidi's counsel shortly after he was arrested in May 2018, along with Ahuja and Shor.  In early June 2018, approximately five weeks after his arrest, Majidi began to proffer with the Government.  He then pled guilty, pursuant to a plea agreement, in October 2018.  Ultimately, Majidi took full responsibility for his conduct.

In addition, in sentencing Majidi, and based on the unique facts and history of this case, the Government believes it is appropriate for the Court to consider the sentences of time served with no additional penalties that were imposed on Ahuja and Shor.  In particular, the Court's sentence should reflect the need to avoid unwarranted sentencing disparities between the defendants in this case.  *See* 18 U.S.C. § 3553(a)(6).

## Restitution

As the Court is aware, the Government did not seek restitution from Ahuja and Shor at sentencing.  However, it is the case that a substantial amount of restitution was paid by Ahuja to the victims in this case.  The Government is not seeking restitution be imposed as to Majidi because the victims have already been compensated through restitution payments made by Anilesh Ahuja. The Government understands that Ahuja has made restitution, or offered to make restitution, to all the victims of the offenses charged in the Indictment.  All of the victims (with a single exception) of the offenses charged in the Indictment have received compensation for their losses and agreed that such compensation fully resolved their restitution claims.  In total, victim investors have received more than $18 million. The remaining victim did not invest directly with PPI or its funds but through Skybridge, a victim who settled its restitution claims with Ahuja.  In advance of the April 2022 plea and sentencing proceeding involving Ahuja and Shor, the Government notified this victim of the proceeding.  The victim did not respond.

## Forfeiture

Because the Court did not order forfeiture for Ahuja and Shor, the Government is not seeking forfeiture from Majidi.

<u>Conclusion</u>

As set forth above, the Government believes that Majidi provided substantial assistance to the Government. The Government therefore expects to request at sentencing that the Court sentence him to time served in light of the relevant facts stated above, including Majidi's substantial cooperation and the need to avoid unwarranted sentencing disparities in this case.

Respectfully Submitted,

DAMIAN WILLIAMS
United States Attorney


By: ____/s/_____
   Andrea M. Griswold
   Assistant United States Attorney
   212-637-1205

cc:    Defense Counsel